

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TEXAS**
**BEAUMONT DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | § | |
| | § | |
| **V.** | § | **CASE NO. 1:12-CR-74** |
| | § | |
| **JAMES GREGORY GRENINGER** | § | |

## FINDINGS OF FACT AND RECOMMENDATION ON MOTIONS TO SUPPRESS

Pursuant to 28 U.S.C. § 636(b) and the Local Rules for the United States District Court, Eastern District of Texas, the District Court referred this matter to the undersigned magistrate for a hearing and the submission of findings of fact and a report and recommendation on *Defendant James G. Greninger's Motion to Suppress Illegally Seized Evidence* [Clerk's doc. #27].

### A.      Procedural History

On June 20, 2012, a federal grand jury returned a two-count Indictment against James Gregory Greninger [Clerk's doc. #13].  Count One of the Indictment charged Greninger with possession with intent to distribute 50 grams or more but less than 500 grams of a mixture or substance containing a detectable amount of methamphetamine, in violation of Title 21, United States Code, Section 841.  Count Two of the Indictment charged Greninger with possession of a .22 caliber revolver during and in relation to a drug trafficking crime, in violation of Title 18,

United States Code, Section 924(c).

On August 3, 2012, Greninger filed his *Motion to Suppress Illegally Seized Evidence* [Clerk's doc. # 27]. In his motion, Greninger argues that the search warrant at issue is insufficient on its face; the items seized are not the items described in the warrant; there was no probable cause for believing the existence of the grounds on which the warrant was issued; and the search and seizure was conducted in bad faith.

On August 29, 2012, the Government filed its *Response to Defendant's Motion to Suppress Illegally Seized Evidence* [Clerk's doc. #34]. In its response, the Government argues that the state search warrant executed at Greninger's residence at 179 Lakeview, Burkeville, Texas was based upon information from a reliable and credible confidential source who was working with law enforcement, who was familiar with illegal narcotics, had been in Greninger's residence within the past seventy-two hours and observed Greninger in possession of illegal narcotics. The Government argues that any items seized were seized pursuant to a valid search warrant which was based on probable cause.

On October 9, 2012, the District Court referred the motion to suppress evidence to the undersigned magistrate judge. *See Order* [Clerk's doc. #41]. After conducting a hearing on the motion to suppress, this court was directed to file appropriate findings of fact and a recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).

On November 28, 2012, a federal grand jury returned a First Superseding Indictment in this case [Clerk's doc. # 48]. Count One charges Greninger with possession with the intent to distribute 50 grams or more of "actual" methamphetamine, in violation of Title 21, United States Code, Section 841(a)(1). Count Two charges Greninger with possession of a .22 caliber revolver during

and in relation to a drug trafficking crime, in violation of Title 18, United States Code, Section 924(c).

On November 30, 2012, Greninger filed his *Amended Motion to Suppress Illegally Seized Evidence* [Clerk's doc. #52]. In this motion, Greninger contends that the Government illegally searched his residence prior to the timely execution of the search warrant; that the warrant is insufficient on its face; that there was no probable cause for believing the existence of the grounds on which the warrant was issued; that the warrant was illegally executed; and that the Government conducted an interrogation of in violation of *Miranda.* This Court conducted a suppression hearing on December 4, 2012.

### B.    Facts Adduced at the Suppression Hearing

The following is a summary of the evidence presented at the suppression hearing, including testimony and exhibits. Officer Josh Hancock is currently employed as a police officer with the Kirbyville, Texas, Police Department. However, on May 18, 2012, he was employed as a narcotics officer for the Newton County, Texas, Sheriff's Department. At that time, Hancock had been employed by Newton County as a narcotics officer for five years.

As a narcotics officer, Hancock was familiar with James Greninger. Hancock had previously arrested Greninger twice for narcotics offenses while Hancock was employed with the Newton County Sheriff's Department.[1] In addition, Hancock also knew that Greninger had previously been arrested by another local law enforcement officer.

On May 18, 2012, Hancock and several other agents and officers met with a confidential

---

[1]    These cases involved offenses occurring in 2008 and 2009. One of the cases was subsequently dismissed by a state judge because of problems with the statute of limitations.

informant who advised that he could purchase a half ounce of methamphetamine from Greninger at Greninger's residence located at 179 Lakeshore Drive, Burkeville, Texas.[2] The officers provided the informant with audio/video recording equipment and gave him instructions for making the narcotics purchase. The officers next searched the informant and his vehicle to ensure that no narcotics were present. The informant was then provided with United States currency to make the transaction.

Officers and agents then followed the informant as he drove to Greninger's residence. The agents parked within close proximity to the residence. A short time later, at approximately 1:00 p.m., officers observed the informant leave Greninger's residence and drive to a predetermined location to meet with the agents and officers. Officers met with the informant and received a clear plastic baggie containing a crystal-like substance which the informant stated to be methamphetamine purchased from Greninger. Special Agent Allison Yates of the Drug Enforcement Administration (DEA) field-tested the substance and it tested positive for methamphetamine. The informant also told agents that he observed an additional amount of methamphetamine in Greninger's possession within the residence. The Newton County Sheriff's Department and other agencies previously utilized this informant to purchase narcotics and the information he had provided to the officers in the past about the controlled purchases had always proven to be true and correct.

The above-stated facts were related to Hancock. Hancock began to prepare the affidavit for

---

[2] The facts are taken from an affidavit submitted in support of a search warrant for Greninger's residence and from the testimony adduced at the suppression hearing.

a search warrant for Greninger's residence at the Jasper County Sheriff's Department.[3]  Newton County District Judge Jerome Owens had informed Hancock that he would be at his (Judge Owen's) residence in Woodville, Texas, and that Hancock could bring the affidavit and search warrant to him there.  Hancock completed the affidavit and search warrant, drove to Woodville and presented the search warrant to Judge Owens.[4]  Judge Owens reviewed it, asked Hancock a few questions, and signed the search and arrest warrant at 6:05 p.m on May 18, 2012.  Hancock drove back to the briefing location.  That drive took approximately 35 to 40 minutes.  Agents and officers from the Drug Enforcement Agency (DEA), Department of Homeland Security/Immigration and Customs Enforcement (ICE), Jasper County Sheriff's Department, Jasper County Police Department, and game wardens from the Texas Parks and Wildlife Department were at the briefing location.  After the briefing, all of the officers went to Greninger's residence, with the game wardens traveling by boat.[5]

Timothy Nelson, an acquaintance of Greninger's, testified that he was fishing from the bank on Greninger's property when he was approached by the game wardens.  According to Nelson, he did not remember the exact time that the game wardens arrived but stated that it must have been between 4:00 p.m. and 5:00 p.m. in the afternoon.   One of the game wardens asked Nelson where

---

[3]    Hancock was at a nearby briefing location before going to the Jasper County Sheriff's Department to type the affidavit.  Hancock testified that the affidavit was prepared at the Jasper County Sheriff's Department rather than at the Newton County Sheriff's Department because it closer to travel to Jasper rather than back to Newton.  Further, he testified that the delay in getting the affidavit completed was due to the fact that agents initially had difficulty in getting the undercover video to download and they wanted confirmation that what the informant had told them about the purchase was true and correct.  The affidavit was admitted into evidence as Government's Exhibit A.

[4]    Hancock testified that, during his five years of employment as a law enforcement officer in Newton County, he had only tendered one other search warrant to Judge Owens for review and approval.  Hancock did testify that he appears before Judge Owens in court.  Hancock had no knowledge of Greninger ever appearing in court before Judge Owens.

[5]  Greninger's home is on an East Texas reservoir.

Greninger was to which Nelson responded that Greninger was in his house. Nelson and the game warden yelled up to the residence and asked Greninger to come down to the shore. Greninger did so and the game wardens detained Nelson and Greninger and handcuffed them. When the rest of the officers arrived at the residence the game wardens came from around the house with Nelson and Greninger. Hancock testified that he and the other officers arrived at the residence at approximately 7:00 p.m.

Hancock was on the entry team and officers entered the residence. One of the officers recorded a "pre-search" video of the residence after the residence was cleared and before officers began searching. Hancock also recorded a video of the search and then exited the residence to remove his tactical vest.

During the search, Greninger was standing with Special Agent Allison Yates (DEA) and Special Agent Jonathan Thomas (Department of Homeland Security) in the front yard. As he exited the house to remove his vest, Hancock advised Greninger of his Miranda warnings. Greninger was handcuffed in front of his body. Hancock testified that did not have his *Miranda* card with him, so he borrowed a card from Sergeant Poindexter with the Jasper County Sheriff's Department. Hancock specifically remembers reading the card to Greninger.[6] Hancock inquired if Greninger understood his *Miranda* warning and Greninger responded affirmatively. Hancock asked Greninger if there was anything illegal inside of the residence and Greninger replied no. According to Hancock, Greninger appeared nervous about having that many officers at his residence. Special Agent Thomas heard Hancock begin to give Greninger his *Miranda* warning but did not hear

---

[6]    Hancock testified that this was at least the third time in his career that he had given Greninger his *Miranda* warnings.

Hancock give the complete warning in its entirety because he (Thomas) was walking by the two men at the time.[7]

Upon execution of the search warrant, officers discovered several hidden compartments inside of the residence which contained drug paraphernalia.[8]  Approximately 148 grams of methamphetamine was located inside a wall behind a fish tank.  Agents recovered a number of firearms from the residence as well as body armor.  The agents recovered the buy money provided to Greninger by the informant among with an additional $11,507.00 in cash.

Late that night, as Greninger was standing with Thomas outside in the yard during the search of the house, he began asking questions about the search.  He then mentioned that he wanted to talk to Thomas about corrupt local law enforcement officers.  Thomas asked Greninger if he wanted to talk and Greninger said that he did but that he had concerns about talking in the yard because he did not trust local county law enforcement.  Thomas asked Greninger if he wanted to go someplace else and Greninger said that he did.  Thomas talked to Yates and she agreed to accompany them. Thomas placed Greninger in the front passenger seat of his vehicle and Yates got in the backseat. Thomas drove to a nearby building owned by the Sabine River Authority which is on a "look-out point"on Toledo Bend Lake.  During the ensuing conversation, Greninger stated that he last used methamphetamine earlier in the day and that his source of supply was a Hispanic male from the Houston area.  He stated that his previous source of supply was a Hispanic male named "J.R." who

---

[7]  Nelson testified that Greninger was detained the entire night at the front of a pickup truck in the yard while Nelson was approximately twenty feet away at the rear of the same truck.  According to Nelson, he (Nelson) was never given his *Miranda* warnings and did not hear anybody give *Miranda* warnings to Greninger.  Nelson later admitted during cross-examination that it was possible that he did not hear everything that was said to Greninger.  Nelson further admitted during cross-examination that he had been previously convicted three times for drug offenses and was still on parole at the time of this incident.

[8]  See Defendant's Exhibit #1 which was a probable cause affidavit signed by Hancock after the search.

was also from the Houston area but had been arrested. Greninger stated something to the effect of "once you are in the game it is hard to get out." According to Thomas, Greninger would then talk and stop and begin to get upset, saying that he had not slept. Thomas felt that it they were not getting anywhere with the investigation so Thomas asked Greninger if he wanted to go back to his house. Greninger responded that he did. Approximately four to five hours had lapsed since Greninger had been given his *Miranda* warning.

According to Thomas, the trip was at Greninger's request and Greninger never objected nor stated that he wished to go back to his residence until Thomas and Yates suggested it. According to Thomas, Greninger was never threatened or promised anything in exchange for making the statements that he made.

**C.    The Search and Arrest Warrant - Legal Analysis and Discussion**

This Court conducts a two-part inquiry to determine whether a seizure conducted pursuant to a search warrant violated the Fourth Amendment. See *United States v. Allen*, 625 F.3d 830, 835 (5th Cir.), *cert. denied* 132 S. Ct. 1632 (2012). First, the Court asks whether the seizure falls within the good-faith exception to the exclusionary rule. *United States v. Leon*, 486 U.S. 897, 920-21, 104 S. Ct. 3405, 82 L. Ed.2d 677 (1984). The good-faith inquiry is confined "to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization." *Leon*, 468 U.S. at 923 n. 23, 104 S. Ct. 3405. Thus, under the good-faith exception, if the evidence obtained by law enforcement officers who relied on the warrant in objectively reasonable good faith, then the evidence obtained during the search is admissible. *United States v. Davis*, 226 F.3d 346, 351 (5th Cir. 2000), *cert. denied* 531 U.S. 1181 (2001) (citing *United States v. Shugart*, 117 F.3d 838, 843 (5th Cir. 1997)). This is true

even if the evidence in the affidavit on which the warrant was based was not sufficient to establish probable cause. *Id.*

The good-faith exception applies unless: (1) the issuing judge was misled by information in an affidavit that the affiant knew to be false or would have been known except for a reckless disregard for the truth; (2) the issuing judge wholly abandoned his neutral judicial role; (3) the warrant was based on an affidavit so lacking in indicia of probable cause as to render faith in it entirely unreasonable, or (4) the warrant is so facially deficient, i.e., in failing to particularize the place to be searched or the items to be seized, that the executing officers cannot reasonable presume it to be valid. *Leon*, 486 U.S. at 923. If the good-faith exception does not apply, then this Court goes to the second step and determines whether the magistrate issuing the warrant had a "substantial basis for believing there was probable cause for the search." *United States v. Cherna*, 184 F.3d 403, 407 (5th Cir.), *cert. denied*, 529 U.S. 1065 (2000).

There has been no evidence presented showing that Judge Owens was misled by information in the affidavit which Hancock knew to be false or would have been known except for a reckless disregard for the truth. The agents at the scene of the controlled purchase went to great lengths to video and audio record the purchase of methamphetamine from Greninger by the informant. Of considerable note is the fact that Hancock and the other officers apparently waited for hours to download the recordings due to technical difficulties and the information concerning the controlled purchase was not incorporated into the affidavit until the recordings could confirm and corroborate the information provided to the officers by the informant. The testimony and the evidence established that Hancock and the other officers delayed the presentation of the warrant until Yates could inform Hancock that the recording corroborated the informant's version of the events in the

residence. Therefore, it is evident that Hancock and Yates did everything that they could to ensure that Judge Owens was presented with an affidavit which contained correct information.

There is also no evidence that Judge Owens abandoned his neutral judicial role. Hancock's testimony established that Judge Owens carefully reviewed the affidavit and signed the search and arrest warrant. Although Hancock has appeared in court as a witness before Judge Owens in the past, this is certainly not an uncommon occurrence in a small county like Newton County. Hancock testified that he has only presented Judge Owens with one prior search warrant. Accordingly, there is not even a suggestion that Judge Owens acted as a "rubber stamp" at the behest of local law enforcement authorities. Further, there is no evidence that Judge Owens had any prior information or knowledge concerning Greninger. Greninger makes much of the fact that the agents could have chosen to present the affidavit to a United States Magistrate Judge in Beaumont, Texas. However, the fact that agents with DEA and ICE chose to request a warrant from a state judge rather than attempt to obtain a federal search warrant from a federal magistrate judge some distance away is not relevant to the issue of whether Judge Owens abandoned his role as a neutral and detached magistrate. This Court holds that he did not.

The third situation applies where an affidavit is "bare bones." A police officer may rely in good faith on the validity of a warrant so long as the warrant is supported by more than a "bare bones" affidavit. *United States v. Cisneros*, 112 F.3d 1272, 1278 (5th Cir. 1997), *cert. denied* 537 U.S. 869 (2002). However, a warrant based on a "bare bones" affidavit that is obviously insufficient to establish probable cause does not justify an officer's reliance. *See Cherna*, 184 F.3d at 406. A bare bones affidavit contains "wholly conclusory statements, which lack the facts and circumstances from which a magistrate can independently determine probable cause." *United States*

*v. Laury*, 985 F.2d 1293, 1311 n. 23 (5th Cir. 1993). An affidavit is bare bones when the affiant merely alleges that the police officer "has cause to suspect and does believe" that contraband is located on the premises of the place to be searched. *United States v. Brown*, 941 F.2d 1300, 1303 n.1 (5th Cir.), *cert. denied* 502 U.S. 1008 (1991) (quoting *Nathanson v. United States*, 290 U.S. 41, 54 S. Ct. 11, 78 L. Ed. 159 (1933)). Similarly, an affidavit is bare bones when the affidavit alleges that police officers "have received reliable information from a credible person and do believe" that contraband would be found. *Brown*, 941 F.2d at 1303 n.1 (quoting *Aguilar v. Texas*, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964)). When probable cause derives from information that the police have obtained from an informant, the totality of the circumstances hinges on: (1) the nature of the information; (2) whether there has been an opportunity for the police to see or hear the matter reported; (3) the veracity and the basis of knowledge of the informant; and (4) whether there has been any independent verification of the matters reported through police investigation. *See Illinois v. Gates*, 462 U.S. 213, 235-40 (1983).

As stated above, the affidavit presented to Judge Owens went into some detail concerning the controlled purchase of methamphetamine from Greninger. The affidavit related that the informant and his vehicle were searched to ensure that the informant was not in possession of controlled substances before the controlled purchase. The informant was equipped with recording equipment and instructed in its use. Officers followed the informant to within a close proximity of Greninger's residence and observed the informant leave Greninger's residence after the purchase. The informant tendered to the officers suspected methamphetamine which he related that he had purchased from Greninger. The informant also related that Greninger was in possession of eleven more ounces of methamphetamine. In Hancock's opinion, the informant was reliable in that he had

been used on other occasions by various law enforcement agencies to do controlled purchases and the information related to the officers concerning those purchases had always proven to be true and correct.

At the outset, this Court concludes that the nature of the information was much more detailed that a situation wherein the informant concludes, without more, that controlled substances are at the premises to be searched. The officers on surveillance, while not having the benefit of being inside the residence with the informant, had an opportunity to see and hear the matters reported by the informant. In sum, the informant entered the residence without possessing methamphetamine and left Greninger's residence with methamphetamine. The informant's reliability had been established through his use in other controlled purchases and his information provided during those controlled purchases. The informant had been in the residence and, apparently, personally observed Greninger with additional methamphetamine. Importantly, Yates independently verified the allegations of the informant by reviewing the recording of the transaction before allowing Hancock to continue to work on the affidavit.[9]

"Affidavits in support of search warrants are routinely held to be sufficient to establish probable cause where they are supported by personal observations of the police officer, *or where there has been some type of controlled infiltration of the suspected residence, such as controlled purchases of contraband from the suspect*, or where information is provided by the informant as to the precise location of the contraband." *United States v. Gallegos*, No. CIVASA-04CR0081XR, 2005 U.S. Dist. LEXIS 10638, 2005 WL 1323296 at *9 (W.D. Tex. June 2, 2005) (emphasis

---

[9] Because the issuing authority was a state judge, the federal "four corners rule" requiring that either the affidavit or recorded oral testimony alone establish probable cause does not apply. See *United States v. Triplett*, 684 F.3d 500, 506 n. 3 (5th Cir. 2012).

added).  The affidavit that Hancock presented to Judge Owens reflected that a controlled purchase of illegal narcotics had occurred at Greninger's residence and that a significant amount of methamphetamine remained at the residence after the purchase.  This affidavit is certainly much more than a "bare bones affidavit" and the officers were entitled to rely on it.

Finally, a close inspection of the search and arrest warrant reveals that it is not so facially deficient, i.e., in failing to particularize the place to be searched or the items to be seized, that the executing officers cannot reasonable presume it to be valid.  During the hearing, counsel for Greninger argued that the scope of the search allowed by Judge Owens (the premises, outbuildings, and vehicles located on Greninger's property) was overly broad in that the informant gave officers no information concerning exactly where the methamphetamine was kept on Greninger's property.  This Court knows of no legal authority which requires an informant to know specifically where narcotics are kept on a premises and no legal authority which requires a court to limit the search of the property to that specific location, and the defendant has cited none.  The facts that a controlled purchase occurred at Greninger's residence and that the informant advised officers that additional methamphetamine remained in Greninger's possession gave officers probable cause to search Greninger's residence, outbuildings, and vehicles on his property.

Finally, in his motion, Greninger contends that the Government illegally searched his residence prior to the timely execution of the search warrant.  Greninger points to the testimony of Nelson who testified that officers (the game wardens) arrived at the home and detained the men between 4:00 and 5:00 in the afternoon.  The face of the warrant shows that Judge Owens signed the warrant at 6:05 p.m.  Hancock testified unequivocally that Judge Owens signed the warrant at 6:05 p.m. and that after it was signed, Hancock traveled back to the staging area and met with other

officers and proceeded to Greninger's home to execute the warrant. Hancock testified that he was on the entry team that executed the warrant and that it was executed around 7:00 p.m.. This Court finds Hancock's testimony extremely credible. On the other hand, Nelson admitted during cross-examination that he has several drug convictions and was on parole at the time of this offense. There is simply no credible evidence that officers somehow entered the residence, began a search, and then subsequently presented a search and arrest warrant to Judge Owens.

### D. Greninger's Post-*Miranda* Statements - Legal Analysis and Discussion

A person subject to interrogation by government agents need be Mirandized "only where there has been such a restriction on a person's freedom as to render him in custody." *Oregon v. Mathiason*, 429 U.S. 492, 495, 97 S. Ct. 711, 50 L. Ed.2d 714 (1977). A person not formally arrested is deemed to be in custody "when a reasonable person in the suspect's position would have understood the situation to constitute a restraint on freedom of movement of the degree which the law associates with formal arrest." *United States v. Courtney*, 463 F.3d 333, 337 (5th Cir. 2006) (internal quotation marks and citations omitted). As stated above, Judge Owens issued a search and arrest warrant based on the purchase of methamphetamine by the confidential informant from Greninger. Greninger was detained and handcuffed at the scene when the search warrant was executed at approximately 7:00 p.m. that night. The remained in custody after that time. This Court finds that Greninger was "in custody" for purposes of *Miranda*.

The Government has proven that Greninger was given his *Miranda* warnings shortly after he was arrested. Hancock testified that he borrowed a card containing the *Miranda* warning from one of his fellow officers and read the contents of the card to Greninger. Greninger acknowledged that he understood the warning. Nelson testified that he was never given his *Miranda* warning and

never heard anyone give the warning to Greninger. However, Nelson freely admitted that he did not hear everything the officers said to Greninger. Again, this Court finds Hancock's testimony to be credible and finds that Greninger was given his *Miranda* warnings.

The issue remaining is whether Greninger's statement was voluntary. "A confession is voluntary if, under the totality of the circumstances, the statement is the product of the accused's free and rational choice." *United States v. Bell*, 367 F.3d 452, 461 (5th Cir. 2004) (citations omitted). The Government bears the burden of proving by a preponderance of the evidence that a challenged confession was voluntary. *Id.* In determining whether a defendant has validly waived his *Miranda* rights, the Court looks at the totality of the circumstances. *United States v. Foy*, 28 F.3d 464, 474 (5th Cir.), *cert. denied* 513 U.S. 1031 (1994). If, under the totality of the circumstances, the statement results from a free and rational choice, then the statement is voluntary. *Bell*, 367 F.3d at 461.

Greninger argues that his statements were involuntary in that they were taken while he was under the influence of methamphetamine and suffering from a lack of sleep. Coercive police conduct is a necessary prerequisite to the conclusion that a confession was involuntary, and the defendant must establish a causal link between the coercive conduct and the confession. *United States v. Blake*, 481 F. App'x 961, 962 (5th Cir. July 26, 2012) (per curiam) (citing *Colorado v. Connelly*, 479 U.S. 157, 163-67, 107 S.Ct 515, 93 L.Ed.2d 473 (1986)). A confession may be involuntary if the defendant is so intoxicated by alcohol or other drugs that the confession is not rationally and freely given. *Id.* Citing *United States v. Kreczmer*, 636 F.2d 108, 110 (5th Cir. 1981). While a defendant's mental condition "may be a significant factor in the voluntariness calculus, this fact does not justify a conclusion that a defendant's mental condition, by itself and apart from its

relation to official coercion, should ever dispose of the inquiry into constitutional voluntariness."
*Connelly*, 479 U.S. at 164, 107 S. Ct. 515. Thus, in the absence of evidence of official coercion, a defendant will have not established that his confession was involuntary. *Id.* Citing *United States v. Raymer*, 876 F.2d 383, 386 (5th Cir. 1989).

There is nothing in the record to suggest that Thomas or Yates used coercive police tactics which took advantage of Greninger's alleged drug usage or lack of sleep on May 18, 2012. It is apparent from the record that Greninger initiated the idea of talking to Thomas about corrupt local law enforcement and freely agreed to go to another location with the agents to discuss the matter. It was at the other location where Greninger advised Thomas and Yates that he had used methamphetamine earlier in the day. There is no evidence that either Thomas or Yates were somehow aware that Greninger had previously ingested methamphetamine earlier in the day and used this fact to induce Greninger to make an involuntary statement. Other than his admission that he used methamphetamine earlier in the day, there was no testimony that Greninger was impaired or intoxicated to the extent that he could not knowingly waive his right to remain silent. There is no evidence of admissions from the officers who testified during the hearing that they believed that Greninger was impaired or under the influence of illegal narcotics. Further, there is no evidence that his statements were procured with promises or other inducements. The record reveals that Greninger was advised of his rights, stated that he understood his rights, and chose to initiate a discussion with law enforcement officers about his source of supply some five hours later. The mere fact that he mentioned to the officers during his statement that he has used methamphetamine does not, in it of itself, make his confession involuntary.

This Court comes to the same conclusion regarding Greninger's statement to the agents that

he had not slept that day. Again, there is no evidence in the record that agents knew before he made that particular statement that Greninger may have been sleep-deprived and took unfair advantage of that fact. There is no evidence that Thomas, Yates, or any of the agents and officers at the scene purposefully denied Greninger of sleep in order to coerce a confession. Hancock testified that the search of the residence was still in progress when he realized that Thomas and Yates had left the residence with Greninger to go to the second location. Again, Greninger's mere mention to the agents that he had not slept, made after the inculpatory statements were made, does not make his confession involuntary.

### E. Conclusion and Recommendation of the Court

Accordingly, having considered the factors and evidence presented, and based upon the facts and conclusions law stated herein, the undersigned magistrate judge recommends that the District Court **deny** *Defendant James G. Greninger's Motion to Suppress Illegally Seized Evidence* [Clerk's doc. #27] and *Defendant James G. Greninger's Amended Motion to Suppress Illegally Seized Evidence*. [Clerk's doc. #52].

### F. Objections

Objections must be: (1) specific, (2) in writing, and (3) served and filed within fourteen (14) days after being served with a copy of this report. *See* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 1(a), 6(b), and 72(b). A party's failure to object bars that party from: (1) entitlement to *de novo* review by a district judge of proposed findings and recommendations, *see Rodriguez v. Bowen*, 857 F.2d 275, 276-77 (5th Cir. 1988), and (2) appellate review, except on grounds of plain error of unobjected-to factual findings and legal conclusions accepted by the district court, *see Douglass v. United Servs. Auto. Ass'n.*, 79 F.3d 1415, 1417 (5th Cir. 1996) (en banc). The constitutional

safeguards afforded by Congress and the courts require that, when a party takes advantage of his right to object to a magistrate's findings or recommendation, a district judge must exercise its nondelegable authority by considering the actual evidence and not merely by reviewing and blindly adopting the magistrate's report and recommendation. *See Hernandez v. Estelle,* 711 F.2d 619, 620 (5th Cir. 1983); *United States v. Elsoffer*, 644 F.2d 357, 359 (5th Cir. 1981) (per curiam).

**SIGNED this the 17th day of January, 2013.**

KEITH F. GIBLIN
UNITED STATES MAGISTRATE JUDGE